**THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
COLUMBUS DIVISION**

| | | |
|---|---|---|
| **CAROLYN KINSER,** | : | |
| | : | |
| **Plaintiff,** | : | |
| | : | **Civil Action** |
| **v.** | : | **No. 4:05-cv-86 (CAR)** |
| | : | |
| **THE PLANS ADMINISTRATION** | : | |
| **COMMITTEE OF CITIGROUP, INC., AS** | : | |
| **ADMINISTRATOR OF THE ASSOCIATES** | : | |
| **FIRST CAPITAL CORPORATION** | : | |
| **LONG-TERM DISABILITY PLAN,** | : | |
| | : | |
| **Defendant.** | : | |
| ‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾ | : | |

## ORDER ON MOTIONS FOR SUMMARY JUDGMENT

Plaintiff Carolyn Kinser brings this action to recover long-term disability ("LTD")

benefits under The Associates First Capital Corporation Long-Term Disability Plan (the "LTD

Plan"), an employee benefit welfare plan governed by the Employee Retirement Income Security

Act ("ERISA"), 29 U.S.C. § 1001, *et seq.*  Currently before the Court are Plaintiff's and

Defendant's cross motions for summary judgment.  Upon review of the claims file, other

evidence submitted by the parties, the arguments of counsel, and the relevant legal authorities,

the Court finds that there is no genuine issue of material fact and that Plaintiff is entitled to

judgment as a matter of law.  Accordingly, Plaintiff's motions for summary judgment [Docs. 32

and 40[1]] are hereby **GRANTED**, and Defendant's motion for summary judgment [Doc. 26] is

hereby **DENIED**.

‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾‾

[1] Plaintiff filed a Motion for Summary Judgment [Doc. 32] and an Amended Motion for
Summary Judgment [Doc. 40].

## I.     Factual Background

This action arises out of Defendant's termination of Plaintiff's LTD benefits which Plaintiff had been receiving under the LTD Plan. The LTD Plan is a component of The Associates Benefits Plan (the "Plan"). Citigroup, Inc. ("Citigroup") is the sponsor of both the Plan and the LTD Plan; Defendant is the Administrator of the Plan; and Metropolitan Life Insurance Company ("MetLife") is the Disability Benefits Administrator of the LTD Plan. Claims for benefits under the LTD Plan initiated prior to January 1, 2002, are funded by Citigroup and LTD Plan participants.

As the Disability Benefits Administrator of the LTD Plan, MetLife terminated Plaintiff's LTD benefits effective May 31, 2003, determining that the evidence in Plaintiff's file did not support a finding that Plaintiff continued to be "totally disabled" under the LTD Plan. Prior to termination, Plaintiff had been receiving LTD benefits for approximately nine years for bipolar disorder. Defendant claims its decision to deny LTD benefits was correct, while Plaintiff claims the decision was wrong and unreasonable.

## A.     The LTD Plan

### 1.     MetLife and the ASA

Defendant, an unincorporated association of persons appointed by Citigroup, is the Administrator of the LTD Plan. On January 1, 2002, MetLife and Citigroup entered into the Disability Benefits Plan Administrative Services Agreement (the "ASA"), wherein Citigroup delegated to MetLife the discretionary authority to determine initial eligibility for disability claims under the LTD Plan and to construe the terms of the LTD Plan. Under the ASA, MetLife is an independent contractor of Citigroup. MetLife's determinations under the LTD Plan are not

subject to ultimate oversight by Citigroup or Defendant, and its determinations, unless found to be arbitrary and capricious, are binding upon Citigroup and Defendant. The ASA was not signed by either party.

## 2. LTD Benefits under the LTD Plan

The LTD Plan provides benefits for covered employees who are "totally disabled" for more than 26 weeks. "Totally disabled" is defined as follows:

> Totally disabled means you have a physical or mental impairment that keeps you from being able to work. You will receive a benefit for up to two years if you are unable to perform the duties of your regular job. After that, you can continue to receive a benefit if:
> -- you are unable to perform the duties of any job with similar pay that you could reasonably be expected to perform considering your training, education or experience; or
> -- you accept rehabilitative work right after any period of total disability. Then you will receive your regular monthly benefit minus 80% of the pay you receive from the rehabilitative work for up to an additional twelve months.
> You must remain under a doctor's care while you are totally disabled to qualify for LTD benefits.

MetLife, as Disability Benefits Administrator, administers and processes claims for benefits under the LTD Plan, determining initial and continued eligibility for benefits. MetLife reviews existing claims to confirm and verify that employees receiving LTD benefits continue to meet the definition of "totally disabled."

## B. MetLife's Review of Plaintiff's Claim

From 1989 through May 1994, Plaintiff worked as a branch manager for First Family Financial Services.[2] On May 20, 1994, Plaintiff was forced to stop working when she was

_____

[2] First Family Financial Services was a subsidiary of the Associates Corporation of North America (the "Associates"). In or around November 2000, Citigroup indirectly acquired the Associates and, hence, became responsible for the Plan.

hospitalized for major depression and suicidal thoughts.  Approximately six months later, after her short term disability benefits ended, Plaintiff applied for and received LTD benefits under the LTD Plan for major depression.  Approximately a year later, on September 16, 1995, the Social Security Administration found Plaintiff disabled due to major depression, and she began receiving Social Security benefits.

From 1994 through 2000, Plaintiff remained under the care of psychiatrists for her mental impairments.  Beginning in May 2000, through the time Plaintiff filed this action, she has been under the continuous care of Dr. Arvind Patel, a psychiatrist who previously treated her in 1994 and 1995.  Dr. Patel diagnosed Plaintiff with major depression and bipolar disorder, mixed type, moderate to severe.    In February 2003, MetLife contacted Plaintiff to obtain current medical information and records to verify that Plaintiff continued to qualify as "totally disabled" under the LTD Plan.

By June 2003, after making repeated requests to Plaintiff, MetLife acquired the following documents from Plaintiff and her treating psychiatrist, Dr. Patel, relating to her current condition: Plaintiff's Personal Profile; Dr. Patel's Attending Physician Statement dated April 28, 2003; Dr. Patel's Psychological Questionnaire dated July 3, 2003; and Dr. Patel's office visit notes relating to Plaintiff dated February 24, 2003, and May 19, 2003.

In Plaintiff's Personal Profile, Plaintiff reported that she was unable to return to work because of depression, insomnia, and panic attacks.  Plaintiff reported that she had trouble sequencing events, short and long term memory problems, and difficulty focusing.  She informed MetLife that she had joint custody of her twelve-year-old son and took care of him when he was with her.  Plaintiff indicated that she would like to return to work but was "terrified" to try,

stating that there was "nothing wrong with the analytical part of [her] mind," she just did not know if she could handle the stress. Plaintiff reported that she performed basic household duties when she had to and was able, and occasionally engaged in activities such as yard work, bowling, driving, listening to music, and working crossword puzzles. However, she stated that she could no longer read or watch movies or television because of her inability to stay focused and comprehend.

In his office visit notes from February 24, 2003, Dr. Patel noted that Plaintiff was still depressed and tearful, crying all of the time, feeling very helpless, hopeless, and worthless. In his Attending Physician Statement dated April 28, 2003, he stated that Plaintiff suffered from depression, chronic fatigue, and loss of interest. However, Dr. Patel's office visit notes from May 19, 2003, indicated that Plaintiff's symptoms were improving. Dr. Patel wrote:

> [Plaintiff] reported that she has been doing much better. She has calmed down and her anxiety and depression have decreased. She has no hallucinations or delusions. She does not have any suicidal or homicidal thoughts. . . . She has been feeling much better. She has fewer mood swings and no crying spells. She does not have any anger outbursts.

Dr. Patel reported in the Psychological Questionnaire that Plaintiff had a current Global Assessment Functioning (GAF) rating of 60, indicating moderate symptoms, and a past GAF rating of 50, indicating serious symptoms.[3] He described her symptoms as severe mood swings,

---

[3] The Global Assessment of Functioning (GAF) scale is a numeric scale (0 through 100) used by mental health clinicians and doctors to rate the social, occupational and psychological functioning of adults. See Am. Psychiatry Ass'n, Diagnostic and Statistical Manual of Mental Disorders (4th ed. 2000) (hereinafter "DSM-IV"). A GAF of 60 indicates "moderate symptoms (e.g., depressed mood and mild insomnia) or moderate difficulty in social, occupational, or school functioning (e.g., few friends, conflicts with peers or co-workers)." Id. A GAF of 50 indicates "serious symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., friends, unable to keep a job). Id.

depression, flashbacks, dysphonic mood, and crying.  He wrote that extreme depression, poor concentration, and disorganized thinking disabled Plaintiff from performing her job and wrote that Plaintiff was "unable to work at all."

Based on a review of this evidence, MetLife determined that Plaintiff's condition was "not severe enough to prevent [her] from returning to work in any occupation for any employer," and by letter dated July 25, 2003, terminated Plaintiff's LTD benefits effective May 31, 2003. Plaintiff appealed this decision and submitted additional medical records from Dr. Patel, including Dr. Patel's August 14, 2003, office visit notes, in which Dr. Patel noted that Plaintiff had "regressed" and was very depressed, tearful, and isolated.  He noted:

> She cannot stop crying.  She now remains isolated and does not go out. She started wearing her sunglasses again.  She cannot concentrate or focus her mind. She feels very tired and she has no energy and no motivation.  She also has anger outbursts and at times she wished she were dead.  She also has severe episodes of panic attacks, anxiety and shaking, trembling when she goes out. When she comes to my office, she remains seated in one corner and will not look up. . . . She has some delusional thinking.  She has severe mood swings and she has highs and lows.  She feels very confused.

At that time Dr. Patel rated Plaintiff with a GAF of 45, indicating "severe symptoms (e.g., suicidal ideation, severe obsessional rituals, frequent shoplifting) or any serious impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job)."  DSM-IV, 34. Regarding her ability to work, Dr. Patel opined:

> In my opinion, this patient is unable to work.  She often goes into regression and relapses, and then she cannot do anything.  I have known this patient for the last 10 years and for the first time in May she started dating someone, and this guy cheated on her.  Now she does not want to talk to anyone else.  She has affective instability ranging from depressed mood to anger outbursts, and feeling of helplessness, hopelessness and worthlessness.  She cannot organize her work and cannot organize her thinking.

> [Plaintiff] used to make good money and used to work as a banker. However, because of her chronic psychiatric problems, she is unable to work. She lost her home and that is also making her more depressed.

In reconsideration of Plaintiff's claim, MetLife engaged an independent physician consultant ("IPC"), Dr. Mark Schroeder, M.D., to review Plaintiff's claim and to provide his opinion as to whether Plaintiff's mental impairment rendered her unable to perform any occupation for which she is reasonably qualified. Dr. Schroeder is board certified in neurology and psychiatry. Dr. Schroeder reviewed Plaintiff's claims file and prepared a Physician Consultant Review dated January 29, 2004 (the "IPC Review"), summarizing his conclusions.

In his IPC Review, Dr. Schroeder concluded that Plaintiff's mental impairment did not render her "totally disabled" under the LTD Plan. In reviewing Dr. Patel's medical records, Dr. Schroeder noted that Plaintiff was being treated only once every three months; that Dr. Patel's office visit notes only described Plaintiff's report of subjective symptoms and her reaction to stressful life events and did not contain a comprehensive mental health evaluation nor a detailed formal mental status exam; that "significant inconsistencies" existed between Dr. Patel's May 19, 2003, office visit notes in which he reported that Plaintiff was "doing much better," and his July 3, 2003, Psychological Questionnaire answers in which he described Plaintiff's symptoms as severe despite not having seen her since the May 19, 2003, office visit; that when Plaintiff saw Dr. Patel on August 14, 2003, Dr. Patel did not recommend any change in her medication or in the frequency of her visits despite her reports of regression. Dr. Schroeder also evaluated Plaintiff's statement in her Personal Profile in which he noted that Plaintiff reported performing essentially a "full range" of daily activities, including taking care of her twelve-year-old son. He also noted that Plaintiff stated there was nothing wrong with the clarity of her thinking and that

she was apprehensive about returning to work because she felt her skills might be outdated.  Dr.

Schroeder concluded in the IPC Review that

> In sum, this claim presents subjective complaints of the employee without corroborating objective evidence (for, example, by a detailed formal mental status examination).  The documents of Dr. Patel present significant inconsistencies in the description of the employee's clinical condition, and the frequency, intensity and nature of treatment does [sic] not support that the employee was receiving active treatment for the remediation of an acute and severe mental disorder.  The employee's own report of her functionality and reasons for not returning to work do not support that the employee is unable to work.

After review of Dr. Schroeder's IPC Review, MetLife found "no documented functional

impairment that would preclude Plaintiff's ability to return to work," and on February 10, 2004

denied Plaintiff's appeal. In response to the IPC Review, Dr. Patel wrote a reply to MetLife on

April 16, 2004, stating:

> I have known Ms. Kinser as a patient for over ten (10) years and have treated her from July 19, 2000 through the present.  Over the course of this period, I have developed a good understanding of Ms. Kinser's condition, diagnosis, disability, and the fact that she is unable to work.

> As you will note from my records, several years ago I diagnosed Ms. Kinser with bipolar depression, mixed, moderate to severe.  This diagnosis was based on her subjective reports as well as my objective findings.

> Ms. Kinser's bi-polar depression is illustrated by many symptoms, including her feelings of hopelessness and worthlessness which leave her tearful, afraid, and prone to uncontrolled outbursts and anger.  Other symptoms include an inability to concentrate and an inability to organize her thoughts.  These symptoms have kept her from being able to maintain her career or, in my professional opinion, to work in any occupation.

> Further, Ms. Kinser's depressive episodes are accompanied by at least one manic or mixed episode.  Specifically, it is common for Ms. Kinser to have periods when her depression seems to relent and she begins to feel more energetic and more in control of her life.  During such times, known as 'mixed or manic episodes,' many patients, including Ms. Kinser, begin to believe that their condition is improving, that there is nothing wrong with them, and that they no longer need treatment and can begin to live a 'normal' life.  Unfortunately, this

short lived feeling of control, an example of which is found in my May 19, 2003 office notes, is a major symptom of bipolar disorder and has always been followed by an extreme depression episode. Ms. Kinser exhibited such extreme depression on August 14, 2003. Evidence of the pattern is found in the notes related to her August 2003 visit where she presented as extremely anxious, unable to make eye contact, afraid, and confused.

Ms. Kinser's subjective reports and my objective findings show no signs of change in Ms. Kinser's overall condition between January 2003 and August 2003; therefore, I did not believe that it was necessary to perform a comprehensive mental health evaluation nor did I perform a detailed formal mental static exam on Ms. Kinser between these dates. Such examinations would have been unnecessary and would not have assisted me in my treatment of Ms. Kinser's disorder.

Bipolar depression, like other forms of depression, is diagnosed based mainly upon the subjective reports of the patient. Therefore, in order to properly diagnose and treat a patient with bipolar depression, a therapist must personally examine the patient. Any diagnosis of a bipolar patient which is not based on a personal dialogue with the patient would be incomplete and unreliable.

For many individuals with psychological problems, work is therapeutic; therefore, I encourage my patients to return to work whenever possible. Unfortunately, work is not an option for Ms. Kinser. Based upon Ms. Kinser's history and findings from my personal examinations, it is my opinion that Ms. Kinser's bipolar depression, and its associated symptoms, including lack of concentration, inability to form rational thoughts, anger, uncontrolled outbursts, and severe anxiety, do not and will not allow Ms. Kinser to work on her own or in any other occupation.

I am surprised and disappointed in the fact that the insurance company providing long term disability benefits has terminated coverage for my patient. I am more surprised that they would do so without attempting to contact me directly or request clarification of my notes. The fact is, no one from the insurance company has ever contacted me to discuss whether Ms. Kinser's condition has changed.

If you or anyone evaluating my opinions at the insurance company would like more information about Ms. Kinser, I will be happy to discuss the matter. In my opinion, Ms. Kinser's condition has been impacted in a negative way by the handling of this matter by the insurance company and the termination of her benefits harmed her condition.

After review of this letter, on May 28, 2004, MetLife reiterated its denial of Plaintiff's claim, stating it had reviewed Dr. Patel's response letter, and the letter did not impact MetLife's original decision to terminate Plaintiff's LTD benefits. Thereafter, Plaintiff filed this action asserting Defendant's termination of her benefits was wrong and unreasonable.

## II. Summary Judgment Standard

Summary judgment is appropriate where there is no genuine issue of material fact. Fed. R. Civ. P. 56(c). Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574 (1986). On a motion for summary judgment, the Court must review the record, and all its inferences, in the light most favorable to the nonmoving party. United States v. Diebold, Inc., 369 U.S. 654, 655 (1962).

Having done so, the Court finds that MetLife's decision to terminate Plaintiff's LTD benefits was wrong and unreasonable.

## III. Standard of Review

Before determining whether to uphold Defendant's denial of Plaintiff's LTD benefits, the Court must first determine the appropriate standard of review it must use to examine Defendant's decisions. There are three standards of review courts must decide among when reviewing an administrator's denial of benefits: (1) de novo, (2) arbitrary and capricious, and (3) heightened arbitrary and capricious. See Williams v. BellSouth Telecomms., Inc., 373 F.3d, 1132, 1134-35 (11th Cir. 2004). A determination of which standard to employ depends upon the discretion granted to the plan administrator in the plan documents. See Firestone Tire & Rubber Co. v.

Bruch, 489 U.S. 101, 115 (1989). Plaintiff argues that the standard of review in this case is *de novo*, while Defendant argues the arbitrary and capricious standard of review applies.

The Court must review *de novo* a claim for denial of benefits "unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." Id. at 109. The *de novo* standard of review "offers the highest scrutiny," because "no deference" is accorded to the administrator's decision. Williams, 373 F.3d at 1137. A court conducting a *de novo* review of the administrator's decision may consider "evidence beyond that which was presented to the administrator at the time the denial decision was made." Shaw v. Conn. Gen. Life Ins. Co., 353 F.3d 1276, 1284 n.6 (11th Cir. 2003) (citing Moon v. Am. Home Assur. Co., 888 F.2d 86, 89 (11th Cir. 1989)).

In contrast, when the administrator has discretionary authority under the plan, the decision is reviewed under the arbitrary and capricious standard of review. To trigger arbitrary and capricious review, "the plan documents at issue [must] explicitly grant the claims administrator discretion to determine eligibility or construe the terms of the plan." HCA Health Servs. of Ga., Inc. v. Employers Health Ins. Co., 240 F.3d 982, 993 (11th Cir. 2001). Under this standard, "the function of the court is to determine whether there was a reasonable basis for the decision based upon the facts as known to the administrator at the time the decision was made." Jett v. Blue Cross & Blue Shield of Ala., Inc., 890 F.2d 1137, 1139 (11th Cir. 1989).

The third standard, the heightened arbitrary and capricious standard of review, is triggered "where the administrator has discretion but exercises it under a conflict of interest." Id. Under this standard, "the burden shifts to the administrator to prove that its interpretation of the plan is not tainted by self-interest." HCA Health Servs. of Ga., Inc., 240 F.3d at 994. In this

case, because the Plan is self-funded, and MetLife, not Defendant, made the decision to deny benefits, there is no conflict of interest; thus the heightened arbitrary and capricious standard is not implicated.

The critical inquiry in determining the appropriate standard of review is whether the administrator making the challenged decision is vested with discretion. An "administrator is vested with discretion only if the plan instrument explicitly grants discretion to the administrator over specific activities." Culp v. Cain, 414 F. Supp. 2d 1118, 1124 (M.D. Ala. 2006) (citing Firestone, 489 U.S. at 112-13). Thus, the Court must look to the language of the plan documents to determine whether a claims administrator is vested with the discretionary authority to make benefits-eligibility determinations so as to trigger an arbitrary and capricious standard of review.

Plaintiff argues that the Court must review this case under the *de novo* standard of review because the LTD Plan does not expressly give discretionary authority to determine eligibility for benefits to MetLife, the decision-maker in this case. Defendant, on the other hand, maintains the Court must review MetLife's decision under the arbitrary and capricious standard of review because Defendant properly designated MetLife as the administrator of the LTD Plan and delegated its discretionary authority to MetLife. Thus, the Court must decide whether MetLife was an authorized party who received a proper delegation of discretionary authority. Because the Court finds MetLife is such a party, the arbitrary and capricious standard of review applies.

Here, the Plan designates the "Committee," defined as members designated by the Board of Directors of the Associates First Capital Corporation, as the Plan administrator and fiduciary. The Plan gives the Committee "discretionary authority to make any finding of fact necessary or appropriate for any purpose under the Plan including, but not limited to, the final determination

12

of the eligibility for and the amount of any benefit payable under the plan or any Welfare

Program." The Plan also gives the Committee authority "to *designate* one or more persons to be

responsible for certain administrative functions vested in the Committee under the terms of the

Plan; such person or persons shall be entitled to act on behalf of the Committee in performing the

administrative functions delegated by the Committee."

Pursuant to 29 U.S.C. § 1005, a plan administrator may delegate its fiduciary duties to a

third party "if the plan provides a clear process for such delegation."[4] <u>Anderson v. UNUM Life</u>

<u>Ins. Co. of Am.</u>, 414 F. Supp. 2d 1079, 1096 (M.D. Ala. 2006). Here, the Plan clearly allows the

Committee, as the plan administrator and fiduciary, to delegate its discretionary authority. Thus,

the issue becomes whether Defendant *properly* delegated its discretion.

In determining whether Defendant's delegation of discretion was proper, and, thus,

whether the arbitrary and capricious standard of review applies in this case, the Court must look

to all of the "plan documents." <u>See</u> <u>Cagle v. Bruner</u>, 112 F.3d 1510, 1517 (11th Cir. 1997) (per

curiam) (court must look to all of the "plan documents" to determine whether the plan affords the

administrator enough discretion to make deferential review applicable.). This Court finds that

Defendant properly delegated its discretion under the ASA, a plan document which properly

delegates Defendant's discretionary authority to MetLife, thereby making deferential review

applicable here. The ASA states that Defendant "has delegated to MetLife, and MetLife has

agreed to assume, responsibility and initial discretionary authority for determining eligibility for

---

[4] Section 1105 of ERISA states in part that "the instrument under which a plan is maintained may expressly provide for procedures . . . for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities."

disability benefits and for construing Plan terms subject to review by the Named ERISA Claim Review Fiduciary."

Plaintiff argues that the ASA should not be considered in determining whether Defendant properly delegated its discretionary authority to make the arbitrary and capricious standard of review applicable for two reasons: (1) the ASA is not signed by the parties, and (2) it is not a "plan document." The Court rejects these arguments. First, the ASA is enforceable despite being unsigned. Under New York law, which governs the ASA, "an unsigned contract may be enforceable, provided there is objective evidence establishing that the parties intended to be bound." Flores v. Lower East Side Serv. Ctr., Inc. 828 N.E.2d 593, 597 (2005). Both Citigroup and MetLife have attested that the ASA represents the operative agreement between the parties and their intent to be bound by the ASA. Accordingly, the ASA is enforceable.

Second, the Court finds the ASA is a proper "plan document." Here, the ASA is incorporated into the Plan. The terms of the Plan define the LTD Plan as a "Welfare Program," which, in turn, is defined as "an arrangement (as evidenced by plan documents, insurance policies, *third party administrative contracts*, summary plan descriptions and other descriptive materials applicable to such arrangement) incorporated into this Plan . . . ." (emphasis added). Both the Supreme Court and the Eleventh Circuit "have reviewed trust documents and other non-[summary plan document] documents in the search for a reservation of discretion for plan administrators and fiduciaries." Cagle, 112 F.3d at 1517 (citations omitted). Although the Eleventh Circuit has not explicitly addressed whether an administrative services agreement may be considered a "plan document" for determining whether the decision of a plan administrator should be reviewed under the arbitrary and capricious standard of review, other courts have held

that discretionary authority granted in an ASA is enforceable. See Semien v. Life Ins. Co. of N. Am., 436 F.3d 805, 810 (7th Cir. 2006) ("[B]ased upon the language of the ASA, the district court correctly found that [defendant] was a fiduciary and had discretionary authority over the administration of the plan"; therefore, defendant's "decisions as plan administrator were entitled to review under an arbitrary and capricious standard."); Dowling v. Metro. Life Ins. Co., 355 F. Supp. 2d 1311, 1315-16 (M.D. Fla. 2004) (court looked to the ASA, which set forth the defendant's authority as claims administrator, to determine the appropriate standard of review as arbitrary and capricious); Campbell v. Chevron Phillips Chem. Co., 2006 WL 2380896, *11-12 (E.D. Tx. 2006) (same); see also Anderson, 414 F. Supp. 2d at 1099-1100 (court looked to the general services agreement and found it delegated defendant's discretionary authority to determine, but reviewed the decision *de novo* because the plan did not authorize defendant to delegate its authority in the first place); Luck v. Metro. Life Ins. Co., 2006 WL 2582939, *6-*7 (C.D. Cal. 2006) (court looked to the ASA and found it granted the administrator discretionary authority, but because the ASA was inadmissible under the Federal Rules of Civil Procedure, determined the standard of review was *de novo*); Murch v. Prudential Welfare Benefit Plan, 2006 WL 1418677, *3 (W.D. Wash. 2006) (court looked to the ASA, but because the parties to the ASA were improper, reviewed the administrator's decision *de novo*).

Accordingly, because the Plan allows the administrator to delegate its discretionary authority, contemplates and incorporates third party administrative services agreements in the terms of the Plan, and properly delegates Defendant's discretionary authority to determine entitlement to LTD benefits to MetLife under the ASA–a valid plan document to consult in

determining the appropriate standard of review–this Court will review MetLife's decision to terminate Plaintiff's LTD benefits using the arbitrary and capricious standard.

Under the arbitrary and capricious standard, the Court must first evaluate the claims administrator's interpretation of the plan *de novo* to determine whether the decision to deny benefits was "wrong." Williams v. BellSouth Telecomms., Inc., 89 F.3d 1132, 1138 (11th Cir. 2004). If the Court agrees with the administrator's decision, *i.e.* that the decision was "right," the court's inquiry ends, and the administrator's decision is affirmed. Id. However, if the Court disagrees with the administrator's decision, *i.e.* that it was "wrong," then the Court must next decide whether reasonable grounds exist in the record to support the defendant's interpretation of the plan or decision. Id. If reasonable grounds for the decision exist, then the decision must be upheld as not being arbitrary and capricious, even if there is evidence that would support a contrary decision. Jett, 890 F.3d at 1140. If reasonable grounds for the decision do not exist, then it is arbitrary and capricious, and the decision must be reversed. Williams, 373 F.3d at 1138. When, as here, the administrator's interpretation is subject to arbitrary and capricious review, the Court may consider only the evidence that was before the plan administrator at the time the benefits decision was made. Jett, 890 F.3d at 1139 (stating that under the arbitrary and capricious standard of review "the function of the court is to determine whether there was a reasonable basis for the decision, based upon the facts known to the administrator at the time the decision was made" to deny coverage).

**IV. Discussion**

**A. MetLife's Decision was Wrong**

Based on a *de novo* review of this case, this Court finds that MetLife's decision to deny Plaintiff benefits was wrong. *De novo* review essentially requires the Court to act as an insurance adjuster and substitute its judgment for the judgment of the claims administrator. A decision is "wrong" if the "the court disagrees with the administrator's decision." Williams, 373 F.3d at 1138.

In its *de novo* review under the arbitrary and capricious standard, the Court must not look beyond the administrative record at the time MetLife made its final denial of coverage. Jett, 890 F.2d at 1139. Therefore, the Court must only consider the following evidence in determining whether MetLife's decision was "wrong" in its determination that Plaintiff was no longer "totally disabled": Dr. Patel's office visit notes dated February 24, 2003, May 19, 2003, and August 14, 2003; Dr. Patel's Attending Physician Statement dated April 28, 2003; Dr. Patel's Psychological Questionnaire dated July 3, 2003; Plaintiff's Personal Profile; Dr. Schroeder's IPC Review; and Dr. Patel's letter to MetLife dated April 16, 2004. The weight of this evidence supports Plaintiff's position that she was disabled, and MetLife was wrong in its decision to terminate Plaintiff's benefits.

When MetLife assumed the administration of Plaintiff's LTD benefits on January 1, 2002, it knew that Plaintiff had been receiving LTD benefits for the past eight years due to Major Depression and Bipolar Affective Disorder, and it certainly would have known a basic definition of bipolar disorder–that it is a mood disorder, sometimes referred to as manic-depression, "characterized by the occurrence of one or more Major Depressive Episodes (lows) accompanied

by at least one Manic Episode (highs)." See DSM-IV. Even assuming, as this Court does, that MetLife did not have the extensive medical records documenting the severity of Plaintiff's mental impairment, MetLife at least knew Plaintiff had remained "totally disabled" for the past eight years. Armed with such knowledge, the medical evidence in Plaintiff's file supports her position that she remained afflicted with a moderate to severe diagnosis of bipolar disorder that rendered her "totally disabled" under the LTD Plan.

Dr. Patel's office visit notes corroborate Plaintiff's position that the so-called May 2003 "improvement" in Plaintiff's condition, where she reported "feeling much better," was but a "manic" or "high" phase of her illness. In February 2003, Dr. Patel observed that Plaintiff was "depressed and tearful"; she was crying "all the time," and feeling "very helpless, hopeless and worthless." Three months later, in May 2003, Dr. Patel noted that Plaintiff reported that she had been "doing much better," that she had "calmed down and her anxiety and depression ha[d] decreased," and that she had no hallucinations, delusions, or crying spells and fewer mood swings. However, by the next visit, in August 2003, Dr. Patel observed that Plaintiff, again, was "very depressed" and had "regressed." Dr. Patel observed that Plaintiff could not stop crying, and noted that she could not concentrate or focus her mind and had "severe episodes of panic attacks, anxiety and shaking, trembling when she goes out." He diagnosed Plaintiff with "bipolar depression, mixed, moderate to severe," rated her with a GAF of 45, and opined that she could not organize her work or her thinking, and, due to her "chronic psychiatric problems," was unable to work.

Plaintiff's GAF scores also demonstrate that she remained "totally disabled" due to her bipolar disorder. In February 2003, Dr. Patel rated Plaintiff with a GAF of 50, indicating serious

symptoms and an inability to work.  In May 2003, Plaintiff had a GAF of 60, indicating moderate

symptoms, and by August 2003, Plaintiff's GAF rating had dropped to 45, again indicating

serious symptoms and an inability to work.  These scores support the theory that Plaintiff's

"improved" symptoms in May 2003 were manifestations of a manic phase of her illness, rather

than an indication of Plaintiff's improvement.

Dr. Patel's statements in the Psychological Questionnaire dated July 3, 2003, also support

Plaintiff's position that she remained disabled.  Dr. Patel, who, at the time he responded to the

Psychological Questionnaire had been continuously treating Plaintiff for the past three years,

reported that Plaintiff exhibited "severe mood swings," "depressive crying spells," and "extreme

depression."  He, again, opined that as a result of her condition, Plaintiff was "unable to work at

all."  Contrary to Dr. Schroeder's findings and Defendant's argument, the Court does not find

"significant inconsistencies" between Dr. Patel's May 2003 office visit notes, where Plaintiff

reported feeling better, and his answers in the July 3, 2003, Psychological Questionnaire, in

which he describes Plaintiff's symptoms as severe despite not having seen her in the interim.  Dr.

Patel had been continuously treating Plaintiff for three years and had known the history of her

disorder for almost ten.  Based on her history, Dr. Patel certainly could have seen Plaintiff's brief

"improvement" as a manic phase of her disorder, as he, in fact, later found.  By the next visit in

August 2003, Plaintiff's condition had worsened and she had "cycled" back into a major

depression.

Defendant argues that Dr. Patel's notes and records support its position that the denial of

Plaintiff's benefits was correct–that the evidence shows Plaintiff was "doing much better," that

her symptoms had subsided, that she was only being seen by her doctor once every three months,

that her medications had remained unchanged, and that she had not had a comprehensive mental health evaluation. However, for Defendant to reach such a conclusion, it essentially had to entirely ignore Dr. Patel's opinion, especially his April 2004 letter in which he thoroughly explains and supports his reasons for determining that Plaintiff is unable to work and directly addresses and refutes Dr. Schroeder's and MetLife's contrary findings. The Court cannot ignore Plaintiff's treating psychiatrist's opinions.

The Court also finds unpersuasive Defendant's contentions that MetLife's decision was correct because neither Dr. Patel's notes nor his records contained any objective medical evidence or formal mental status examination to support his conclusion that Plaintiff's bipolar disorder prevented her from working. First, Defendant cannot rely on the subjective evidence from Dr. Patel's May 2003 office visit notes, in which Plaintiff reports that she is doing much better, to support its position, and then turn around and fault Plaintiff's use of the subjective evidence from Dr. Patel's February and August 2003 office visit notes, in which Plaintiff reports severe episodes of panic attacks, anxiety and shaking, to support her position. Second, psychiatric conditions such as Plaintiff's are not easily proven by purely "objective" measures. Bipolar disorder is diagnosed and treated based on the patient's self-reported symptoms. There are no x-rays, CT scans, MRIs, blood tests, or machines to measure or "objectively" prove bipolar disorder. To the extent bipolar can be established by "objective" evidence, Plaintiff's medical records do reveal "objective" clinical observations. In answering his Psychological Questionnaire, Dr. Patel reported that Plaintiff's objective symptoms included dysphoric mood, crying, and frequent migraines. In his August 14, 2003, office visit notes, Dr. Patel observed that Plaintiff could not stop crying, and that she remained seated in one corner of his office and

would not look up.  Finally, Defendant contends that the absence a formal mental status evaluation ("MSE") indicates Plaintiff did not provide adequate medical evidence to support her disability.  However, a MSE is not a purely objective test; it is based in part on subjective measures (what the patient says) and in part on objective measures (what the doctor observes).  See Guy E. Brannon, MD, History and Mental Status Examination, http://www.emedicine.com/med/topic3358.htm (last visited March 26, 2007).  Furthermore, MetLife could have required Plaintiff to obtain a formal mental status evaluation, but it did not do so.

Defendant's argument that the frequency (Dr. Patel only saw Plaintiff once every three months) and intensity (Dr. Patel did not change Plaintiff's medication) of Plaintiff's treatment supports its decision, is also unpersuasive.  The fact that Dr. Patel did not increase her office visits or change her medication only supports Plaintiff's position that she continued to be disabled, and her condition had not changed.

Defendant also argues that Plaintiff's statements in her Personal Profile justify its termination of her benefits.  However, Defendant placed disproportionate weight on selected excerpts from her statements.  Defendant summarized Plaintiff's Personal Profile by concluding that "she is able to perform daily activities, household chores, and hobbies, and that she is able to take care of her son."  However, Plaintiff described her present condition as follows:

> bipolar II, managed with medication (not ideally, but ok), depression.
> Psychological: insomnia, panic attacks, sometimes have trouble sequencing
> events, memory problems long & short, difficult to keep focused–cannot run
> numbers thru [sic] my mind anymore but can with calculator.  I recognize that
> most difficulties occur when stress is high.  I try to recognize my 'triggers' and
> use learned coping skills.  However, when a manic comes on, or afterwards a deep
> depression, there is not a lot coping skills can do other than to remind myself to

‘roll with it’ as it will eventually pass.  I am not able to function during these
periods but with regular medication they do not occur as frequently as in the past.

In describing her daily routine, Plaintiff responded, "I do not have a daily routine–I try and

sometimes I succeed, those are the good days."  She stated that sleep is difficult, and that she has

an "unquiet" mind which will not shut off.  Plaintiff did state that she would love to return to

work but was "terrified" to return because her "skills are outdated."  Plaintiff also stated that

there was "<u>nothing</u> wrong with the analytical part of [her] mind." (emphasis in original).

However, Plaintiff also stated that she "honestly" did not "know if [she] could [return to work]

stress-wise/relearning wise."  Furthermore, although Plaintiff indicated she could perform basic

housework, take care of her son, and engage in activities such as bowling, driving, listening to

music, and working crossword puzzles, she also stated that she hardly ever reads or watches

movies or television because it is "hard to stay focused and sometimes comprehend, and that

frustrates [her]."  She also responded that she was not active with family, church, social or other

groups in any way.  Even if these responses did indicate that Plaintiff could perform a "full

range" of "daily" and household activities, as Defendant suggests, they do not translate into an

ability to perform the duties of a job with similar pay to that of her former job at First Family

Financial Services.

Finally, the Court finds MetLife's reliance on Dr. Schroeder's determination that Plaintiff

was not disabled unpersuasive.  Dr. Schroeder's opinion that the medical documentation does not

support a determination that Plaintiff is disabled directly contradicts Dr. Patel's opinion that

Plaintiff is unable to work.  However, Dr. Schroeder never spoke with nor personally evaluated

Plaintiff, nor did he speak to Dr. Patel, Plaintiff's treating physician.  Dr. Schroeder's opinion

was based on a file review of Dr. Patel's three office visit notes from February, May, and August

2003; Dr. Patel's psychological questionnaire and attending physician statement; and Plaintiff's Personal Profile. The Court finds Dr. Patel's opinions, based on a ten-year relationship with Plaintiff, more credible and reliable than Dr. Schroeder's opinion based on a cold file review of limited medical evidence.

While it is true that insurance companies do not have to apply the "treating physicians rule" and accord *per se* special evidentiary weight to the opinions of treating physicians, "[p]lan administrators may not arbitrarily refuse to credit a claimant's reliable evidence, including the opinions of a treating physician." Black & Decker Disability Plan v. Nord, 538 U.S. 822, 834 (2003). Here, MetLife was wrong to essentially ignore Dr. Patel's clearly stated and supported opinion that Plaintiff was unable to work in any type of position.

**B.     MetLife's Decision was Not Reasonable**

Having concluded Defendant's decision "wrong" pursuant to a *de novo* review, the next step in an arbitrary and capricious review is to determine whether, despite being "wrong," the decision was reasonable. An administrator's decision to deny benefits is "reasonable" when "there was a reasonable basis for the decision, based upon the facts as known to the administrator at the time the decision was made." Jett, 890 F.2d at 1139. Here, in order for MetLife to determine Plaintiff was no longer disabled, it had to focus exclusively on Dr. Patel's May 19, 2003, office visit notes and the opinion of Dr. Schroeder, and essentially ignore the opinion of Dr. Patel, Plaintiff's treating psychiatrist. Such a selective review of the evidence and reliance on a cold record file review by a non-examining doctor establishes that MetLife's decision was not made "rationally and in good faith" and is therefore unreasonable. Griffis v. Delta Family Care Disability Plan, 723 F.2d 822, 825 (11th Cir. 1984).

MetLife obviously relied on Dr. Patel's May 19, 2003, office visit notes in denying Plaintiff's LTD benefits and ignored the remaining evidence establishing that Plaintiff continued to be disabled under the LTD Plan. As explained above, the evidence as a whole supports Plaintiff's position that she remained disabled. The *only* evidence indicating that Plaintiff's condition had improved was the May 19, 2003, office visit notes. However, as explained above, such an "improvement" is actually an indicator of a "manic" phase of Plaintiff's condition, as evidenced from Dr. Patel's office visit notes from Plaintiff's next appointment in August 2003, and as explained in Dr. Patel's April 16, 2004, letter addressed to MetLife. The Court finds MetLife's reliance on the May 19, 2003, office visit notes unreasonable.

Furthermore, MetLife's reliance on Dr. Schroeder's opinion was unreasonable. Dr. Schroeder's opinion that Plaintiff was not disabled was based on a one-time file review of limited medical evidence. He never personally examined nor spoke to Plaintiff. It is unreasonable for Defendant to essentially disregard the opinion of Plaintiff's treating psychiatrist in favor of an opinion of a non-treating, non-examining psychiatrist. There can be no serious doubt that a psychiatric opinion of a treating psychiatrist is more reliable than an opinion based on a one-time file review. Moreover, the credibility of Dr. Schroeder's opinion is clouded by the fact that he earns a living conducting one-hour file reviews for disability insurance companies such as MetLife, Aetna, and Liberty Mutual. From 2003 to 2005, he performed approximately 1800 file reviews for MetLife alone and earned more than $230,000.00. MetLife provided him with his own office, a computer ,and a standardized template for his reports. This evidence was certainly part of the "facts known to the administrator at the time the decision was made" and therefore proper for the Court to consider. Jett, 890 F.2d at 1139.

Although Defendant states that it relied on more than Dr. Schroeder's report, MetLife's final denial letter in this case parrots Dr. Schroeder's opinion almost word for word, and Defendant's stated reasons for the denial are the exact reasons Dr. Schroeder points to in his IPC Review.  For the reasons cited above, Defendant's reliance on his opinion was unreasonable.

## CONCLUSION

As set forth above, the Court finds that MetLife's denial of Plaintiff's LTD benefits was wrong and unreasonable.  Accordingly, Plaintiff's motions for summary judgment [Docs. 32 and 40] are **GRANTED**, and Defendant's motion for summary judgment [Doc. 26] is **DENIED**.


**SO ORDERED**, this 29th day of March, 2007.


S/ C. Ashley Royal
C. ASHLEY ROYAL
UNITED STATES DISTRICT JUDGE


SSH/aeg